**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ESSENCE HEALTHCARE, INC.,<br>ESSENCE HEALTHCARE PPO, INC.<br><br>*Plaintiffs,*<br><br>v.<br><br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES, et al.,<br><br>*Defendants.* | Case No. _________________ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Essence Healthcare, Inc. ("Essence Healthcare"), and Essence Healthcare PPO, Inc. ("Essence PPO," together, "Essence"), submit the following Complaint for declaratory and injunctive relief against Defendants Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS, and Mehmet Oz, MD, in his official capacity as Administrator of CMS (collectively, "Defendants" or "CMS"), and alleges as follows:

## INTRODUCTION

1. This is yet another case in which CMS miscalculated two Medicare Advantage Plans' ("MA Plans'") Star Ratings, causing serious and irreparable harms to the plans and their members that will persist if left uncorrected.

2. Essence are Medicare Advantage organizations based in St. Louis, Missouri, formed by a group of doctors in 2003 that were looking for a better way to provide high-quality care for their Medicare patients.

3. Essence's mission is to improve the well-being of its members and communities,

ensuring high-quality, affordable, and person-centered care to create a healthier future for every individual and community it serves.

4. Consequently, Essence offers some of the nation's best performing MA Plans.

5. Specifically, Essence Healthcare, Inc., offers a Health Maintenance Organization MA Plan, pursuant to Contract No. H2610, which serves approximately 50,000 members in Arkansas, Illinois, Indiana, Kentucky, and Missouri.

6. And Essence Healthcare PPO, Inc., offers a Preferred Provider Organization MA Plan, pursuant to Contract No. H6200, which is serves approximately 11,000 members in Arkansas, Illinois, Indiana, Kentucky, and Missouri.

7. In 1997, Congress created the Medicare Advantage program, known as Medicare Part C, to create private competition and provide seniors greater choice and higher-quality healthcare.[1]

8. Under this program, the Secretary of HHS, acting through CMS, contracts with private healthcare plans, known as MA Plans, to provide healthcare benefits that meet or exceed those provided by traditional Medicare, effectively shifting the financial risk of providing healthcare to beneficiaries from the federal government to privately run MA Plans.

9. To promote MA Plans to prospective enrollees, promote competition among MA Plans, and determine how MA Plans are paid, CMS annually calculates and publishes "Star Ratings," which represent the quality of each plan on a scale of 1 to 5 Stars, including half-Stars.

10. To do so, CMS calculates Star Ratings for numerous "measures" reflecting improvements to a beneficiary's health, actions that can help improve a beneficiary's health,

[1] Between 1997 and 2003, the Medicare Advantage program went by other names, such as Medicare+Choice.

patient experiences, processes and issues that can create barriers to receiving needed care, and services that can assist with maintaining, monitoring, or improving a beneficiary's health.

11. Because Congress was concerned with the burden the Secretary of HHS might place on plans to report certain data, it specifically limited the Secretary's authority to calculate Star Ratings using only "data collected under section 1395w-22(e) of this title," 42 U.S.C. § 1395w-23(o)(4)(A), in order to "minimize reporting burden[s] on the industry," *see AvMed, Inc. v. Becerra*, No. 20-3385, 2021 WL 2209406, at *11 (D.D.C. June 1, 2021) (cleaned up).

12. In addition to limiting the sources of data CMS may use when calculating Star Ratings, Congress requires CMS to promulgate through notice-and-comment rulemaking any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]," pursuant to 42 U.S.C. § 1395hh(a)(2).

13. But because CMS's methodology, the measures themselves, and the specifications for *how* the measures are calculated (*i.e.*, determined) change each year, CMS does not codify its measures through notice-and-comment rulemaking in the Federal Register.

14. Instead, CMS sets forth the measures and its methodology in its annual Technical Notes, which provide a summary description of the specifications for each measure, the data on which those measures are based, and how those measures are calculated.

15. For example, to calculate the 2027 Star Ratings, CMS utilized 32 measures for Part C ("C01-C32") and 13 measures for Part D ("D01-D13").[2]

[2] *See* Medicare 2027 Part C & D Star Ratings Technical Notes at 31–115, CENTERS FOR MEDICARE AND MEDICAID SERVICES, https://www.cms.gov/files/document/2027-tech-notes-2026-09-30.pdf (hereinafter "2027 Technical Notes") (last visited Nov. 23, 2026).

16. But despite Congress's instruction to use only "data collected under section 1395w-22(e)," 42 U.S.C. § 1395w-23(o)(4)(A), CMS nevertheless collects and uses data from a variety of other sources to calculate Star Ratings, including "Prescription Drug Event" ("PDE") data, "Call Center" data, and "Independent Review Entity" ("IRE") data. *See generally* 2027 Technical Notes.

17. Compounding these errors, when calculating the 2027 Star Ratings, CMS increased the weighted value of two specific measures – Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health) – by designating them as "health outcome measures," thus giving them a weighted value of 3, one of the highest weights given to any specific measure. 2027 Technical Notes at 36–38 (Measures C04 & C05) & 136 (listing weighting categories and numerical weights for each measure); *see also* 42 C.F.R. § 422.166(e)(1)(ii) (giving health outcome and intermediate outcome measures a weighted value of 3).

18. Worse, CMS did so even though these two measures are based on subjective Health Outcome Surveys ("HOS") through which patients report whether they believe their physical or mental health is the same or better than expected after two years. 2027 Technical Notes at 36–38.

19. Although these measures are meant to measure plan performance, they fail to reliably account for natural, age-related decline or changes in physical or mental health that are outside an MA Plan's control. Indeed, CMS admitted these reliability concerns when it specifically excluded these two measures from the 2022 Star Ratings.[3]

---

[3] CMS, *Fact Sheet - 2022 Part C and D Star Ratings*, at 3 (2022), https://www.cms.gov/files/document/2022-star-ratings-fact-sheet1082021.pdf (last visited Nov. 23, 2026).

20. Tellingly, except for Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health), *all* other "health outcome measures" and "intermediate outcome measures" are based on objective, reliable data. 2027 Technical Notes at 136–37 (listing weighting categories for each measure) & 130–31 (listing primary data sources for each measure).

21. In other words, CMS inexplicably chose to measure physical and mental health outcomes by using subjective patient surveys – assigning them heightened weight and thus giving them greater influence over Star Ratings – instead of objective, claims-based measures that capture actual service delivery and health outcomes despite having no evidentiary basis for doing so.

22. Considering CMS refuses to codify consistent, stable specifications for its chosen measures in the Code of Federal Regulations through notice-and-comment rulemaking, instead choosing to regularly change and update these measures through annual "Technical Notes," it is unsurprising the Medicare Payment Advisory Commission, a non-partisan, independent agency that advises Congress on Medicare issues, confirmed CMS's Star Ratings system is "overly complex," "distributes financial rewards inequitably," and "reports inaccurate information on quality."[4]

23. Recently, numerous courts have also recognized the various ways in which CMS has deviated from the system and process that Congress mandated in calculating Star Ratings.

24. For example, in 2024, two different judges of this Court held CMS's unilateral

---

[4] Medicare Payment Advisory Comm'n, Replacing the Medicare Advantage Quality Bonus Program, in Report to the Congress: Medicare and the Health Care Delivery System, ch. 3 at 51 (June 2020), https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun20_ch3_reporttocongress_sec.pdf (last visited Nov. 23, 2026).

changes in its required benchmarks for "good" performance violated CMS's own regulations. *See SCAN Health Plan v. HHS*, No. 1:23-cv-3910-CJN, 2024 WL 2815789, at *1 (D.D.C. June 3, 2024) (Nichols, J.); *see also Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 25 (D.D.C. 2024) (Moss, J.).

25. And just last year, the United States District Court for the Southern District of Georgia issued a detailed, seventy-plus page opinion holding CMS's ever-shifting regulatory approach, in determining a plan's 2026 Star Ratings, failed to (1) comply with Congress's mandate to calculate Star Ratings using only data collected under section 1395w-22(e) and (2) promulgate numerous measures through notice-and-comment rulemaking. *Clover Ins. Co. v. HHS*, No. 2:25-cv-142, 2026 WL 1483515, at *8–15 & 22–25 (S.D. Ga. May 27, 2026).

26. In the wake of that decision, CMS announced a partial recalculation of the 2026 Star Ratings – omitting the ten measures based on data that exceeded CMS's statutory authority – recalculating Star Ratings for certain plans and offering others the opportunity to opt into recalculated Star Ratings based on that holding. *See* CMS, Update to 2027 Quality Bonus Payment Determinations (June 17, 2026) ("Recalculation Memo").

27. But CMS inexplicably refused to give ***all MA Plans*** the benefit of the second holding from *Clover Ins. Co.*, namely, the removal of measures that CMS did not promulgate "by regulation" as required by 42 U.S.C. § 1395hh(a)(2). *See id.*

28. Then, CMS doubled down on its unlawful conduct by once again calculating Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 using data that exceeds CMS's statutory authority and measures that it did not promulgate through notice-and-comment rulemaking.

29. And CMS did so even though it calculated Clover's 2027 Star Ratings without the

measures the Southern District of Georgia found unlawful in *Clover Ins. Co.*

30. In other words, CMS gave Clover the benefit of the *Clover Ins. Co.* decision when calculating its 2027 Star Ratings, but CMS refused to extend that same benefit to Essence.

31. Consequently, for the first time in six years, Essence Healthcare's overall Star Ratings for Contract No. H2610 plummeted below 4.5 Stars to 4.0 Stars, and Essence PPO's overall Star Ratings for Contract No. H6200 was likewise only 4.0 Stars.

32. CMS publicly disclosed Essence's Star Ratings on CMS's website, resulting in irreparable harm to Essence's reputation, goodwill, and competitive position and impairing its ability to attract beneficiaries during the 2027 enrollment period, which is currently open but will close on December 7, 2026.[5]

33. CMS's unlawful calculation of Essence's 2027 Star Ratings also deprives it of a higher rebate percentage that Essence could use to increase benefits or reduce cost sharing for its members, improving its competitiveness and profitability.

34. Accordingly, Essence brings this action to obtain relief for the unlawful actions CMS engaged in to calculate Essence's 2027 Star Ratings, which caused immediate and irreparable harms to its reputation, market and competitive position, and more importantly, undermined Essence's effort to keep approximately 61,000 Medicare beneficiaries healthy and independent.

## PARTIES

35. Essence are Missouri business corporations, with their principal place of business

[5] CMS, *Important Dates for Health Insurance from Medicare, the Health Insurance Marketplace, Medicaid, and CHIP*, https://www.cms.gov/files/document/n-909384-important-cms-enrollment-dates.pdf (last visited Nov. 23, 2026).

in St. Louis, Missouri.

36. Defendant HHS is the department of the federal government ultimately responsible for the federal Medicare and Medicaid programs.

37. HHS delegated its authority to administer the Medicare and Medicaid programs to CMS. *See* Centers for Medicare & Medicaid Services; Statement of Organization, Functions and Delegations of Authority; Reorganization Order, 66 Fed. Reg. 35437 (July 5, 2001).

38. Defendant CMS is a federal agency within HHS with the primary oversight responsibility for the Medicare program and the federal portion of the Medicaid program, which was created by the Reorganization Act of 1977. *See id.*

39. Defendant Robert F. Kennedy, Jr., is named in his official capacity as the Secretary of HHS. *See* 42 C.F.R. § 405.1136(d)(1).

40. Defendant Dr. Mehmet Oz, is named in his official capacity as Administrator of the Centers for Medicare and Medicaid Services. The Administrator is responsible for the administration of the Medicare program, including the Star Ratings. *Id.*

**JURISDICTION, VENUE & EXHAUSTION**

41. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and 42 U.S.C. §§ 1395 *et seq.*

42. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States and a substantial part of the events giving rise to Essence's claims occurred in this District.

43. Although CMS allows MA Plans to review the data and informally raise issues with Star Ratings calculations, CMS does not permit MA Plans to challenge "the methodology

for calculating the star ratings." 42 C.F.R. § 422.260(c)(3)(iii). Accordingly, the instant challenge to the 2027 Star Ratings for Contract Nos. H2610 and H6200 is not subject to an administrative exhaustion requirement. *See SCAN Health Plan*, 2024 WL 2815789, at *4 n.3.

44. The Complaint is timely under 28 U.S.C. § 2401(a).

## REGULATORY AND FACTUAL BACKGROUND

### *The Medicare Program*

45. Medicare is a federal healthcare program, created by Title XVIII of the Social Security Act ("SSA"), that provides government-funded health insurance to seniors (aged 65 years and older), certain disabled persons, or persons with end-stage renal disease. *See* Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588 (Jan. 28, 2005); 42 U.S.C. § 1395kk(a).

46. CMS is the federal agency responsible for administering the Medicare program, which is comprised of Parts A, B, C, and D. *See* 70 Fed. Reg. at 4589.

47. Part A covers inpatient hospital treatment, and Part B covers outpatient services.

48. Together, Parts A and B are known as "traditional" or "original" Medicare, which uses a fee-for-service payment model, *see* 42 U.S.C. § 1395w-22(a)(1), meaning CMS reimburses providers directly for the services they provide to beneficiaries, *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872–73 (D.C. Cir. 2021).

49. By contrast, under Part C (also known as the Medicare Advantage program), private companies (known as Medicare Advantage organizations), offer MA plans.

50. In other words, the Medicare Advantage program shifts the financial risk of providing health care to beneficiaries from the federal government to privately run MA Plans.

51. These MA Plans provide at least the same services that Medicare beneficiaries

would receive through traditional Medicare, 42 U.S.C. § 1395w-22(a), but also include additional benefits not covered by traditional Medicare, such as dental and vision benefits. *UnitedHealthcare Ins. Co.*, 16 F.4th at 872.

52. For example, Medicare Part D is a prescription drug benefit in which MA Plan enrollees may choose to enroll, unless they have equivalent coverage for their employer, or pay a penalty. *See generally* 42 U.S.C. §§ 1395w-101–1395w-104.

53. To further compete for beneficiaries, MA Plans may also provide lower co-payments and other cost sharing, which further reduce their cost of covered services.

54. To fund Medicare Advantage benefits under Part C, the government pays Medicare Advantage organizations a pre-determined monthly sum to provide all Medicare-covered services to the beneficiaries enrolled in their plan, determined through an annual bidding system. *See* 42 U.S.C. § 1395w-23.

55. To determine an MA Plan's monthly payment, CMS compares the plan's "bid," which estimates the cost for covering Medicare-covered benefits to an average enrollee for the upcoming year, to a "benchmark," which represents what it would cost CMS to provide Medicare benefits to an average enrollee in an MA Plan's service area. *Id.* §§ 1395w-23(b)(1)(B) & 1395w-23(n).

56. If the bid is below the benchmark, CMS pays the Medicare Advantage organization its bid and returns a specific percentage of the difference between the benchmark and the bid as a "rebate," which the organization uses to provide additional benefits or otherwise return to plan participants through lower premiums or cost sharing. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i) & 1395w-23(a)(1)(E); 42 U.S.C. § 1395w-24(b)(1)(C).

57. But if a bid is at or above the benchmark, the Medicare Advantage organization

receives monthly payments at the benchmark rate and must charge enrollees an additional premium to cover the amount by which the bid exceeds the benchmark. *Id.* §§ 1395w-23(a)(1)(B)(ii) & 1395w-24(b)(2)(A); *see also Medicaid & Medicare Advantage Prods. Ass'n of P.R. v. Emanuelli Hernández*, 58 F.4th 5, 8 n.1 (1st Cir. 2023); *Elevance Health, Inc.*, 736 F. Supp. 3d at 5–6.

58. To compete with original Medicare and other Medicare Advantage organizations, MA Plans aim to bid below the benchmark, and often do so, to remain competitive on both premiums, including lower Part D premiums and providing supplemental benefits.

59. Individuals enrolled in Medicare may thus elect to receive their Parts A and B benefits under Part C instead of original Medicare.

***The Star Ratings System***

60. To encourage MA Plans to offer high quality plans, and to assist Medicare beneficiaries in selecting a plan, CMS annually calculates and publishes numerical ratings for each MA Plan, known as Star Ratings.

61. The Star Ratings are designed to be "a true reflection of the plan's quality" and must be based on data that is "complete, accurate, reliable, and valid." Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs, and the PACE Program, 83 Fed. Reg. 16440, 16520 (Apr. 16, 2018).

62. To meet these obligations, CMS must calculate Star Ratings using clear and unambiguous calculations, which it must promulgate through notice-and-comment rulemaking. *See* 42 U.S.C. § 1395hh(a)(2); 42 C.F.R. §§ 422.164(c)(2), 422.164(d)(2), 423.184(c)(2) & 423.184(d)(2).

63. The Star Ratings are based on a five-star scale, 1 star being the lowest and 5 stars being the highest. *See* 42 U.S.C. § 1395w-23(o)(4)(A); 42 C.F.R. §§ 422.162(b)(1) & 422.166(a)(4); *see also* 42 C.F.R. §§ 423.180(b)(2) & 423.182(b)(1).

64. Star Ratings are based on various quality and performance “measures.” *See* 42 C.F.R. §§ 422.162(a) & 423.182(a). These measures include but are not limited to preventative health services, management of long-term conditions, member experiences with the health plan, member complaints, and customer service. 2027 Technical Notes at 31–115.

65. CMS first determines each MA Plan’s raw scores on each measure.

66. CMS then converts the raw scores into measure-level Star Ratings and then calculates each plan’s overall Star Ratings by running a weighted average of all measures. *See SCAN Health Plan*, 2024 WL 2815789, at *1–2.

67. The scale uses four thresholds, or “cut points,” to divide the measure scores into five “whole star increments.” 42 C.F.R. §§ 422.166(a)(1), 422.166(a)(4) & 423.186(a)(4).

68. From the measure-level Star Ratings, CMS calculates Part C and Part D “summary” ratings, which reflect the weighted mean of a contract’s measure-level Star Ratings, with some measures counting more than others. *Id.* §§ 422.166(c) & 423.186(c).

69. The Affordable Care Act incorporated Star Ratings into two statutory formulas that determine payments to MA Plans. *See* Affordable Care Act, Pub. L. No. 111–148, 42 U.S.C. § 1102(c)–(d), 124 Stat. at 1043–46 (2010).

70. The first formula, codified at 42 U.S.C. § 1395w-23(o), known as the “quality bonus payment,” rewards MA Plans rated 4 Stars or higher with an increased 5 percent benchmark against which to bid.

71. This either increases the total amount of money the MA Plan is eligible to receive,

including in the form of a rebate (if its bid is below the benchmark) or reduces the premium the MA Plan must charge its members (if its bid is above the benchmark).

72. The second formula, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark as a rebate.

73. For example, MA Plans with 3 Stars or lower receive 50 percent; MA Plans with 3.5 and 4 Stars receive 65 percent, and MA Plans with 4.5 and 5 Stars receive 70 percent. Rebates are used to lower patient cost sharing and premiums and fund supplemental benefits not offered under traditional Medicare, such as dental and vision benefits. *See, e.g.*, Medicare Program; Contract Year 2021 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, and Medicare Cost Plan Program, 85 Fed. Reg. 33796, 33885–86 (June 2, 2020).

74. In addition to the higher percentage rebate, MA Plans with 4 or more Stars receive quality bonus payments (i.e., additional funds), *see* 42 U.S.C. § 1395w-23, which MA Plans use to provide additional benefits and services to their members and thus further improve their care.

75. Consequently, MA Plans that are better at keeping their members healthy by effectively managing their care and providing important related services receive higher Star Ratings and, overall, perform better in the marketplace. *See, e.g.*, *id.*

76. As such, Star Ratings are the lifeblood of the Medicare Advantage program, determining each Medicare Advantage organization's plan-specific benchmark and rebate percentage and, thus, determining CMS and beneficiary payments to the MA Plan for the services it provides and the benefits it can offer.

77. Moreover, MA Plans (including Essence) use Star Ratings to target areas of

improvement and investment to ensure they are maximizing their services for beneficiaries and, in turn, to earn higher Star Ratings.

78. But any changes to the Star Ratings calculations can have serious, and sometimes catastrophic, impacts on MA Plans.

79. Indeed, just a half-Star increase can result in hundreds of millions of dollars in additional funding for a single MA Plan and potentially billions of dollars across all MA Plans a Medicare Advantage organization offers.

80. And when Star Ratings fall – because CMS changes the criteria or its calculation methodology – MA Plans may be disqualified from receiving quality bonus payments and can even be removed from the Medicare Advantage program altogether, resulting in devastating financial and coverage consequences for MA Plans and their beneficiaries.

81. For example, MA Plans that consistently receive Star Ratings below 3 stars may be terminated from the Medicare Advantage program altogether. *See* 42 C.F.R. § 422.510(a)(4)(xi).

82. Once calculated, Star Ratings are widely available to Medicare beneficiaries to consider when choosing to enroll in an MA Plan. These measures are particularly important because they enable beneficiaries to compare health plans based on quality.

83. To that end, CMS prominently displays Star Ratings in its online and print resources outlining available MA Plans.

84. For example, through its online Medicare Plan Finder tool, CMS displays MA Plans to prospective members in order of highest to lowest Star Ratings with the express purpose of guiding beneficiaries to higher-rated plans first.

85. Medicare beneficiaries use the Star Ratings to assess the quality of the MA plans,

and agents and brokers use the Star Ratings to assist beneficiaries with selecting a plan that fits their health care needs. *Elevance Health, Inc.*, 736 F. Supp. 3d at 6–7.

86. The Star Ratings thus influence each plan's position in the marketplace by affecting how prospective enrollees perceive the comparative quality of various plans.

87. As such, Star Ratings have tremendous value to MA Plans and are strong incentives for these plans to provide quality care and comprehensive benefits to their members, allow them to compete in the marketplace, receive higher compensation, and even remain eligible to continue participating in the Medicare Advantage program.

88. Given their significance, CMS must treat each MA Plan "fairly and equally," judging them only on matters under their "control," in a system that "minimize[s] unintended consequences" adopted through a "process of developing [a ratings methodology that] is transparent and allows for multi-stakeholder input." 83 Fed. Reg. 16440, 16521.

***The Measures And Data CMS Uses To Calculate Star Ratings***

89. Pursuant to its unilateral program guidance, CMS considers 40 or more distinct "measures" of a plan's quality to derive the plan's Star Ratings from year to year. *See, e.g.*, 2027 Technical Notes at 31–115.

90. CMS breaks those measures into five broad categories: outcome measures, intermediate outcome measures, patient experience measures, access measures, and process measures, 2027 Technical Notes at 1, with each category receiving different weighted values to calculate the Star Ratings, 42 C.F.R. §§ 422.166(e)(1)(ii)–(v).[6]

---

[6] Improvement measures are also a category, but they are separate from the other measures because they are "derived through comparisons of a contract's current and prior year measure scores" unlike the other measures "which are derived from data sources external to the Star Ratings." 2027 Technical Notes at 5; 42 C.F.R. § 422.166(e)(1)(i).

91. "Outcome measures reflect improvements in a beneficiary's health and are central to assessing quality of care," and "[i]ntermediate outcome measures reflect actions taken which can assist in improving a beneficiary's health status." 2027 Technical Notes at 1.

92. "Patient experience measures reflect beneficiaries' perspectives of the care they received," while "[a]ccess measures reflect processes and issues that could create barriers to receiving needed care." *Id.*

93. And "[p]rocess measures capture the health care services provided to beneficiaries which can assist in maintaining, monitoring, or improving their health status." *Id.*

94. To calculate the different measures, CMS uses data from a variety of sources.

95. For example, certain measures are based on "data collected under section 1395w-22(e) of this title," 42 U.S.C. § 1395w-23(o)(4)(A), which refers to data each Medicare Advantage organization is required to collect, analyze, and report to CMS. 42 U.S.C. §§ 1395w-22(e)(1) & 1395w-22(e)(3)(A)(i) ("[E]ach M[edicare] A[dvantage] organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality."); *see also* 42 C.F.R. §§ 422.152(e)(2)(i)–(ii) (requiring MA Plans to "measure performance" using standard measures, "report its performance to CMS," and "[c]ollect, analyze, and report quality performance data identified by CMS").

96. That data generally consists of (1) "Healthcare Effectiveness Data and Information Set ("HEDIS"), a data set of performance measures"; (2) HOS surveys, "a quality-improvement-focused outcome measure utilizing patient-reported data; and (3) the Consumer Assessment of Healthcare Providers and Systems ("CAHPS"), a family of consumer and patient surveys focused on the interpersonal aspects of healthcare." *Clover Ins. Co.*, 2026 WL 1483515, at *4 & 8 (noting CMS did not dispute "the data sources for Section 1395w-22(e)'s 'quality

improvement program' data are HEDIS, HOS, or CAHPS"); *see also* Medicare Program; Establishment of the Medicare Advantage Program, 69 Fed. Reg. 46866, 46886 (Aug. 3, 2004) (identifying HEDIS, HOS, and CAHPS as the required measurement systems for the quality improvement program).

97. For other measures, however, CMS uses PDE data, Call Center data, and IRE data, which are either submitted to or collected by CMS or one of its independent contractors.

***Notice And Comment On Star Ratings Measures***

98. CMS's methodology, the measures themselves, and the specifications for *how* the measures are calculated (*i.e.*, determined) change each year because of "regular updates and revisions contemplated by the rules [CMS] ha[s] finalized" in various regulations. 83 Fed. Reg. 16440, 16537 (Apr. 16, 2018).

99. Consequently, CMS refuses to codify its Star Ratings measures through notice-and-comment rulemaking in the Federal Register, instead choosing to set them out in annual Technical Notes. *Id.*

100. The Technical Notes provide a partial, summarized description of the specifications for each measure, the data on which those measures are based, and how those measures are calculated.

101. But to actually calculate each measure, CMS must utilize the detailed specifications contained in its other sub-regulatory guidance, including specific Technical Notes pertaining to each measure. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (specifying the calculation of two measures, among other sources of guidance).

102. For the 2027 Star Ratings, CMS originally utilized 32 measures for Part C ("C01-

C32") and 13 measures for Part D ("D01-D13").[7]

103. But before evaluating a plan with a given Star Ratings measure, CMS must undertake public notice-and-comment rulemaking concerning that measure.

104. This obligation stems from two separate sources of law relevant to this case.

105. *First*, since 2018, CMS's regulations have provided that, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must first publicly propose the measure (on its website), elicit public feedback prior to the measurement year, and then formally engage in notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act [42 U.S.C. § 1395w-23] and then subsequently will propose and finalize new measures through rulemaking."); *id.* § 423.184(c)(2) (same for Part D); *id.* §§ 422.164(d)(2) & 423.184(d)(2) (same applies to substantial changes to measures).

106. *Second*, CMS has a statutory obligation to promulgate Star Ratings measures "by regulation," in other words, through notice-and-comment rulemaking and promulgation in the Code of Federal Regulations.

107. CMS must promulgate "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 587 U.S. 566, 569–70 (2017) (recognizing that "Congress chose to write a

[7] *See* CMS, *2027 Star Ratings Measures & Weights*, https://www.cms.gov/files/document/2027-star-ratings-measures.pdf (last visited Nov. 23, 2026).

new, Medicare-specific" "notice-and-comment regime" under § 1395hh).

***The Clover Litigation***

108. On November 7, 2025, Clover filed suit in the Southern District of Georgia, challenging the application of a number of measures used to calculate Clover's 2026 Star Ratings, which determined payments for the 2027 plan year. *See Clover Ins. Co. v. HHS*, No. 2:25-cv-142, 2026 WL 1483515, at *1 (S.D. Ga. Nov. 7, 2025).

109. The Southern District of Georgia ultimately granted in part Clover's motion for summary judgment based on two primary holdings. *See id.*

110. *First*, the Southern District of Georgia held certain measures could not be validly applied to Clover to determine its 2026 Star Ratings because they exceeded CMS's statutory authority under 42 U.S.C. § 1395w-23(o) and § 1395w-22(e). *Id.* at *8–14.

111. Specifically, the court held CMS could not use Measures C32 (Reviewing Appeals Decisions), C33 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (MTM Program Completion Rate for CMR), and D12 (Statin Use in Persons with Diabetes) to calculate Clover's 2026 Star Ratings because their primary data sources were PDE data, Call Center data, or IRE data, not data from HEDIS, HOS, or CAHPS.[8] *See id.* at *8–9.

---

[8] In *Clover Ins. Co.*, the Court used shorthand for the challenged measures, which differs slightly from the official titles in CMS's 2026 Technical Notes, including C32 (Appeals Decisions), C33 (Phone Call Center), D01 (Phone Call Center), D08 (Medication Adherence, Diabetes), D09 (Medication Adherence, Hypertension), D10 (Medication Adherence, Cholesterol), D11 (Medication Therapy Management), D12 (Pharmacy Statin Use). Although these measure numbers are from the 2026 Technical Notes, Essence challenges most of the same Part C and D Measures, some of which CMS renumbered in the 2027 Technical Notes at issue in

112. The court further held CMS could not use Measures D05 (Rating of Drug Plan), and D06 (Getting Needed Prescription Drugs) to calculate Clover's 2026 Star Ratings because, although CAHPS is their primary data source, "these two measures use data collected under Part D authority, not Part C, where Section 1395w-22(e)'s grant of authority is located." *Id.* at *9. Accordingly, "neither measure D05 nor measure D06 rely on 'data collected under section 1395w-22(e).' " *Id.* (quoting 42 U.S.C. § 1395w-23(o)(4)(A)).

113. *Second*, that court held ten additional measures could not be validly applied to Clover to determine its 2026 Star Ratings because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2). *Id.* at *22–25.

114. Those measures were C03 (Annual Flu Vaccine), C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Needed Care), C23 (Getting Appointments and Care Quickly), C24 (Customer Service), C25 (Rating of Health Care Quality), and C27 (Care Coordination).[9]

115. That is because Congress provided a specific notice-and-comment requirement for Medicare, providing that any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment

---

this case. Specifically, for the 2027 Star Ratings, the Part C Measure for Call Center - Foreign Language Interpreter and TTY Availability is C32 (not C33), and Measure for Statin Use in Persons with Diabetes is D11 (not D12). *See generally* 2027 Technical Notes. And CMS removed the Part D Measure for MTM Program Completion Rate for CMR from the 2027 and 2028 Star Ratings with plans to return the measure for the 2029 Star Ratings. *See id.* at 2.

[9] Again, these measure numbers are based on CMS's 2026 Technical Notes and Star Ratings calculations at issue in *Clover Ins. Co.* Here, Essence challenges some of the same Part C Measures, some of which CMS renumbered in the 2027 Technical Notes at issue in this case. Specifically, for the 2027 Star Ratings, the measure for Getting Appointments and Care Quickly is C22 (not C23), and the measure for Customer Service is C23 (not C24). *See* 2027 Technical Notes at 68–72.

for services, or the eligibility of individuals, entities, or organizations to furnish or receive" such benefits, must be promulgated "by regulation," in other words, published in the Code of Federal Regulations and subjected to notice and comment. 42 U.S.C. § 1395hh(a)(2).

116. The court correctly held the Star Ratings measure specifications qualify as "statement[s] of policy" for purposes of § 1395hh(a)(2), a point that CMS did not dispute. *See Clover Ins. Co.*, 2026 WL 1483515, at *22 (citing *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017)).

117. As the court explained, "Star Ratings measure specifications qualify as statements of policy" that must be promulgated by regulation under § 1395hh(a)(2) because they "let the public know the agency's current adjudicatory approach to a critical question involved in calculating ratings for [MA] plans nationwide." *Id.*

118. The court also held the specifications for Measures C03 (Annual Flu Vaccine), C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Needed Care), C23 (Getting Appointments and Care Quickly), C24 (Customer Service), C25 (Rating of Health Care Quality), and C27 (Care Coordination) each provided a "substantive legal standard," which CMS did not contest. *Id.* at *22–23.

119. The measure specifications constitute a "substantive legal standard" because "CMS's Star Rating calculations function to define the scope of [Medicare Advantage organizations'] legal rights to rebates by impacting the percent of per capita savings a plan can receive." *Id.* at *23.

120. Finally, the court found the subject standards did in fact "govern the payment for services because they serve as a 'deciding principle' for such payments." *Id.* at *24 (quoting

Webster's III New Int'l Dictionary 982).

121. As the court explained, "CMS is . . . obligated by statute to offer additional funding to plans with better Star Ratings" and "[t]he fact that the ratings trigger statutorily mandated funding increases is more than mere influence or an indirect effect; it is a deciding principle in the payment amount." *Id.*

122. Therefore, CMS's decision to use the ten disputed measures to determine Clover's 2026 Star Ratings "trigger[ed] the notice-and-comment requirements in Section 1395hh(a)(2)," and CMS's failure to engage in the required notice-and-comment rulemaking for those measures made the calculation of Clover's 2026 Star Ratings using those measures procedurally invalid. *Id.* at *25.

***CMS's Recalculation Of The 2026 Star Ratings***

123. Three weeks following the decision in *Clover Ins. Co.*, CMS issued a memorandum on June 17, 2026 announcing an update to the 2026 Star Ratings calculations (which impact 2027 plan payments) in light of the *Clover* decision and announcing a partial recalculation of Star Ratings for certain plans. Recalculation Memo at 1.

124. The memorandum explained CMS "recalculated the 2027 quality bonus payment ratings for MA [Medicare Advantage] organizations only using data collected under 42 U.S.C. § 1395w-22(e) as of November 1, 2003," in accordance with the *Clover* court's first holding. *Id.* Indeed, CMS also removed Measures C29 (Members Choosing to Leave the Plan) and C31 (Plan Makes Timely Decisions about Appeals) that it apparently believed were affected by the first holding, even though the *Clover* court did not rule on those measures.[10] *Id.*

---

[10] Here, Essence challenges some of the same Part C Measures, which CMS renumbered in the 2027 Technical Notes at issue in this case. Specifically, for the 2027 Star Ratings, the measure

125. The memorandum also invited plans whose overall Star Ratings had increased as a result of the recalculation to resubmit their bids for plan year 2027, in light of the significant revenue effects that the Star Ratings changes would have on the bids.

126. But the Recalculation Memo did not provide for a recalculation removing the additional measures CMS had not promulgated "by regulation." *Compare* Recalculation Memo, *with Clover Ins. Co.*, 2026 WL 1483515, at *22–25.

***CMS Unlawfully Determines Essence's 2027 Star Ratings Using Data Not Authorized By Statute***

127. Based on its high-quality care and services, Essence has historically received top-tier Star Ratings that are critical to its operations and ability to serve its members.

128. For example, Essence Healthcare received overall Star Ratings of 4.5 Stars or higher for 6 straight years, from 2021 to 2026.

129. On October 8, 2026, CMS issued Essence HealthCare's 2027 Star Ratings for Contract No. H2610, which received 4.0 Stars for Part C, 4.0 Stars for Part D, and 4.0 Stars overall, and Essence PPO's 2027 Star Ratings for Contract No. H6200, which received 4.5 Stars for Part C, 3.0 Stars for Part D, and 4.0 Stars overall.

130. But to calculate these 2027 Star Ratings, CMS used numerous measures that are based on data that is not collected from MA Plans.

131. Indeed, Congress specifically restricted the data that CMS can use to calculate Star Ratings, requiring it to use only "data collected under section 1395w-22(e) of this title." *Clover Ins. Co.*, 2026 WL 1483515, at *8.

132. For good reason: Congress was "concerned with the reporting burden that the

---

for Members Choosing to Leave the Plan is C28 (not C29), and the measure for Plan Makes Timely Decisions about Appeals is C30 (not C31). *See* 2027 Technical Notes at 79–81 & 83–84.

Secretary might place on insurers," so it "limited the Secretary's authority" under Section 1395w-22(e)(3) in order to "minimize [the] reporting burden for the industry." *AvMed, Inc. v. Becerra*, No. 20-3385, 2021 WL 2209406, at *11 (D.D.C. June 1, 2021) (citing 83 Fed. Reg. at 16520).

133. As such, Section 1395w-22(e) provides that "each M[edicare] A[dvantage] organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality." 42 U.S.C. §§ 1395w-22(e)(1) & 1395w-22(e)(3)(A)(i).

134. To implement this requirement, CMS requires MA Plans to "measure performance" using standard measures, "report its performance to CMS," and "[c]ollect, analyze, and report quality performance data identified by CMS." 42 C.F.R. § 422.152(e)(2).

135. Despite Congress's statutory mandate, CMS calculated Essence's 2027 Star Ratings using Measures C28 (Members Choosing to Leave the Plan), C30 (Plan Makes Timely Decisions about Appeals), C32 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D05 (Rating of Drug Plan), D06 (Getting Needed Prescription Drugs), D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults), all of which are based on data that was ***not*** "collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A).

136. For example, to calculate Measure C28 (Members Choosing to Leave the Plan), CMS uses data from its Medicare Beneficiary Database Suite of Systems ("MBDSS"), which is a

compilation of administrative data that CMS collects. 2027 Technical Notes at 79–81.

137. To calculate Measure C30 (Plan Makes Timely Decisions about Appeals), CMS uses data from an independent contractor known as the IRE to determine how quickly plans send information for an independent review. 2027 Technical Notes at 83–84.

138. To calculate Measures C32 (Call Center - Foreign Language Interpreter and TTY Availability) and D01 (Call Center - Foreign Language Interpreter and TTY Availability), CMS uses "Call Center" data, which evaluates the percentage of time that TTY services and foreign language interpretation were available when a CMS contractor (a "test" caller) speaking a foreign language called the plan's customer service line. 2027 Technical Notes at 86–89.

139. And to calculate Measures D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults), CMS uses PDE data, which are summary extracts of prescribing information generated each time a beneficiary fills a prescription under Medicare Part D, whether or not that beneficiary is part of Medicare Advantage. 2027 Technical Notes at 101–15.

140. Although CMS calculates Measures D05 (Rating of Drug Plan) and D06 (Getting Needed Prescription Drugs) using CAHPS data, that alone does not mean the data was "collected under section 1395w-22(e)." *Clover Ins. Co.*, 2026 WL 1483515, at *9; *see also* 2027 Technical Notes at 95–98.

141. That is because "there are two different sources of data collection authority relevant to this inquiry: Part C authority to collect data (for example, via Section 1395w-22(e)(3)) and Part D authority to collect data (for example, via Section 1395w-104(d))." *Id.*

142. "Part D gives the Secretary the authority to conduct consumer satisfaction surveys regarding PDP sponsors and prescription drug plans 'in a manner similar to the manner such surveys are conducted for M[edicare] A[dvantage] organizations and MA plans under part C.' " *Id.* (quoting 42 U.S.C. § 1395w-104(d)).

143. Because CMS calculates Measures D05 (Rating of Drug Plan) and D06 (Getting Needed Prescription Drugs) using "data collected under Part D authority, not Part C, where Section 1395w-22(e)'s grant of authority is located, neither measure D05 nor measure D06 rely on 'data collected under section 1395w-22(e).' " *Id.* (quoting 42 U.S.C. § 1395w-23(o)(4)(A)).

144. Accordingly, CMS calculated Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 using data that is ***not*** "collected under section 1395w-22(e) of this title." 42 U.S.C. § 1395w-23(o)(4)(A).

145. And critically, CMS conceded as much: "CMS bases Part C Star Ratings on the type of data specified [in § 1395w-22e] and on CMS administrative data." 42 C.F.R. § 422.162(c)(1); *see also* 83 Fed. Reg. at 16532 (conceding "the type of data used for Star Ratings will be data consistent with [§ 1395w-22e] limits *and data gathered from CMS administration of the M[edicare] A[dvantage] program*" (emphasis added)); Medicare Program; Contract Year 2019 Policy and Technical Changes to the Medicare Advantage, Medicare Cost Plan, Medicare Fee-for-Service, the Medicare Prescription Drug Benefit Programs, and the PACE Program, 82 Fed. Reg. 56336, 56497 (Nov. 28, 2017) (same).

146. CMS thus unlawfully determined Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 using these measures, even though they are not based on data collected under Section 1395w-22(e).

***CMS Unlawfully Determines Essence's 2027 Star Ratings Using Measures It Did Not Promulgate Through Notice-And-Comment Rulemaking***

147. But CMS's errors did not stop there. Despite the Southern District of Georgia's decision in *Clover Ins. Co.*, CMS unlawfully determined Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 using numerous unlawfully promulgated measures: Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), and C28 (Members Choosing to Leave the Plan).

148. CMS did so even though it did not promulgate the specifications for these measures through notice-and-comment rulemaking.

149. But Congress required CMS to do just that. Specifically, the Medicare Act states that "no rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2).

150. Critically, CMS uses its measures and the resulting Star Ratings to determine its payments to Essence as well as Essence's benefits offered to beneficiaries, payments to providers, and eligibility to participate in the Medicare Advantage program. *Id.* §§ 1395w-23(o)(1); 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.260, 422.266(a)(2)(ii); *SCAN Health Plan*, 2024 WL 2815789, at *1 (highlighting CMS is "obligated" to "offer additional funding to plans with better Star Ratings" and "higher-rated plans can then use those extra funds to lower costs for their beneficiaries or to provide them with additional benefits").

151. CMS also uses measures and the resulting Star Ratings to determine whether it must terminate underperforming MA Plans. Indeed, CMS terminates plans that have Part C Star Ratings below 3 Stars for three consecutive years. *See* 42 C.F.R. § 422.510(a)(4)(xi).

152. As such, the specification of Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), and C28 (Members Choosing to Leave the Plan) are a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2); *Allina*, 863 F.3d at 943 (recognizing that HHS's measures "used to calculate the payment that providers will receive for providing healthcare services to low-income patients" fell under § 1395hh(a)(2)).

153. Because the specification of each measure determines "the scope of benefits," "payment for services," and Essence's "eligibility" to participate in the Medicare Advantage program, these measures ***must*** be promulgated "by regulation" – meaning notice and comment rulemaking. *See* 42 U.S.C. § 1395hh(a)(2).

154. Although CMS has codified in the Code of Federal Regulations almost every material aspect of its Star Ratings system, including procedures governing how the Star Ratings are calculated, *see generally* 42 C.F.R. §§ 422.160–66 & 423.180–86, CMS inexplicably treats the specification of measures differently so it can change these specifications from year to year. 83 Fed. Reg. at 16537 ("CMS will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated [by CMS].").

155. For that reason, CMS did not promulgate "by regulation" any of the specifications for Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), and C28 (Members Choosing to Leave the Plan) that it used to determine Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200.

156. To be sure, although CMS has identified the names and high-level descriptions of the measures in prior Federal Register announcements, CMS ***has not*** provided in the Federal Register the specifications for how the measures are determined. *See, e.g.*, 83 Fed. Reg. at 16531–32.

157. This is critical because CMS cannot calculate Star Ratings without using the specifications in its Technical Notes, which CMS publishes annually but does not promulgate through notice-and-comment rulemaking.

158. So, even if publication in the Federal Register sufficed to promulgate a standard "by regulation," CMS has failed to publish within the Federal Register the actual specifications necessary to determine Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), and C28 (Members Choosing to Leave the Plan).

159. As the D.C. Circuit long ago explained, "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect*,' 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide

shall contain only 'each Federal regulation of general applicability and current or future effect,' 1 C.F.R. § 8.1 (1986)." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986); *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (same).

160. Accordingly, CMS cannot apply the measures identified above to Essence because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

***CMS Unlawfully Determines Essence's 2027 Star Ratings By Giving Increased Weight To Subjective Surveys***

161. Compounding its errors when calculating Essence Healthcare's 2027 Star Ratings, CMS increased the weighted value of Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health) by designating them as "outcome measures" – that is, giving them a weighted value of 3, one of the highest weights given to any specific measure. 2027 Technical Notes at 36–38 (Measures C04 & C05) & 136 (listing weighting categories and numerical weights for each measure); 42 C.F.R. § 422.166(e)(1)(ii) (giving outcome and intermediate outcome measures a weighted value of 3).

162. Worse, CMS did so even though these two measures are based on subjective HOS surveys through which patients report whether they believe their physical or mental health is the same or better than expected after two years. 2027 Technical Notes at 36–38.

163. Although these measures are meant to measure plan performance, they blindly ignore the unfortunate reality that the health of many elderly enrollees naturally declines with age and changes in physical or mental health that are outside an MA Plan's control.

164. In addition, because patient surveys are influenced by countless external factors and noise, all of which is beyond an MA Plan's control, there is no reliable data rationally connecting those survey responses to the actual quality of MA Plan performance.

165. As such, CMS's decision to assign these measures a weighted value of 3 effectively punishes – through lower Star Ratings – Medicare Advantage organizations like Essence that voluntarily choose to serve the most vulnerable and chronically ill among our nation's aging population.

166. And tellingly, except for Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health), *all* other "health outcome measures" and "intermediate outcome measures" are based on objective, reliable data. 2027 Technical Notes at 136–37 (listing weighting categories for each measure) & 130–31 (listing primary data sources for each measure).

167. In other words, CMS inexplicably chose to measure physical and mental health outcomes by using subjective patient surveys – assigning them heightened weight and thus giving them greater influence over Star Ratings – instead of objective, claims-based measures that capture actual service delivery and health outcomes despite having no evidentiary basis for doing so.

168. But that is not all. Survey methodologies introduce sampling variability, response bias, and recall limitations that do not accurately reflect actual MA Plan performance.

169. Surveys also inevitably lead to survey fatigue and declining response rates, which compromise the representativeness and reliability of survey-based measurement.

170. CMS has acknowledged as much by strongly encouraging MA Plans and vendors to "NOT" ask Medicare enrollees any survey questions four weeks before, during, or after certain CMS survey periods "to promote response rates to both MA & PDP CAHPS and

additional data collection efforts."[11]

171. Yet CMS failed to consider, let alone address, any of these factors.

172. Worse, CMS violated its own regulations. Although CMS previously proposed substantive updates to these measures in the Federal Register in 2020, Medicare and Medicaid Programs; Contract Year 2021 and 2022 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicaid Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly, 85 Fed. Reg. 9002, 9045 (Feb. 18, 2020), CMS ultimately decided to remove these measures from the Star Ratings for several years, Medicare and Medicaid Programs; Contract Year 2022 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicaid Program, Medicare Cost Plan Program, and Programs of All- Inclusive Care for the Elderly, 86 Fed. Reg. 5864, 5919 (Jan. 19, 2021), before reintroducing them in 2026.[12]

173. But before reintroducing them in 2026, and using them to calculate Essence's 2027 Star Ratings, CMS did not follow the notice-and-comment procedure required by its own regulations, which require CMS to "propose and finalize new measures through rulemaking." 42 C.F.R. § 422.164(c)(2); *see also Elevance Health, Inc.*, 736 F. Supp. 3d at 25 (D.D.C. 2024) (holding CMS's failure to abide its own regulations when calculating Star Ratings was arbitrary and capricious).

174. Because CMS did not follow – and instead, violated – its own regulations before reintroducing Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or

---

[11] Medicare Advantage and Prescription Drug Plan CAHPS Survey, FAQs for Contracts, https://ma-pdpcahps.org/en/faqs/faqs-for-contracts/ (last visited Nov. 23, 2026).

[12] *See* CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates & Pt. C & Pt. D Payment Policies* (Jan. 10, 2025), https://www.cms.gov/files/document/2026-advance-notice.pdf (last visited Nov. 23, 2026).

Maintaining Mental Health) – or consider and address the countless problems with designating them as "outcome measures" – CMS cannot apply these measures to calculate Essence Healthcare's 2027 Star Ratings for Contract No. H2610.[13]

***Defendants' Unlawful Conduct Has Caused Essence To Suffer Substantial And Irreparable Harms***

175. CMS's unlawful conduct has caused and continues to cause Essence and its members to suffer severe and irreparable harms.

176. Defendants have improperly calculated Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 using Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), C28 (Members Choosing to Leave the Plan), C30 (Plan Makes Timely Decisions about Appeals), C32 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D05 (Rating of Drug Plan), D06 (Getting Needed Prescription Drugs), D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults).[14]

177. Upon information and belief, CMS thus erroneously deprived Essence of at least 4.5 Star Ratings for Contract Nos. H2610 and H6200 by unlawfully (1) using measures that are

---

[13] CMS did not use Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health) to calculate Essence's 2027 Star Ratings for Contract No. H6200 because that plan was too new to be measured using those performance measures.

[14] *See supra* Note 12.

not based on data collected under § 1395w-22(e), (2) using measures that were not promulgated through notice-and-comment rulemaking, and/or (3) giving measures increased weight even though they are based on subjective patient surveys.

178. As a result, upon information and belief, Defendants have issued Essence fundamentally flawed Star Ratings of 4.0 instead of at least 4.5 Stars for Contract Nos. H2610 and H6200.

179. The impact of that significant drop in Essence's Star Ratings is serious and substantial.

180. A Star Ratings of 4.0 Stars leaves Essence ineligible for increased rebates for Contract Nos. H2610 and H6200.

181. Upon information and belief, this will result in a direct loss of at least approximately $15 million to which Essence would have been entitled with a Star Ratings of 4.5 Stars or higher in 2027.

182. Star Ratings (both measure-specific and overall) are publicized on CMS's website, and CMS informs beneficiaries that Star Ratings reflect a plan's quality.

183. By unlawfully assigning Essence a Star Ratings of 4.0 Stars for Contract Nos. H2610 and H6200, CMS has erroneously indicated to beneficiaries that Essence's plan quality is inferior to that of other competing plans.

184. The reduced Star Ratings have further undermined Essence's competitive position, reputation, and goodwill, and impacted its ability to compete against other plans, including those that may have benefited from Defendants' flawed and unlawful methodology.

185. Upon information and belief, if CMS had calculated Essence's 2027 Star Ratings without these unlawful measures, Essence's Star Ratings would have remained at least 4.5 Stars

for Contract Nos. H2610 and H6200, entitling Essence to a higher rebate percentage, which would benefit Essence and its members.

186. Essence now turns to this Court to redress these grave harms by requiring Defendants to comply with federal law, vacating the flawed 2027 Star Ratings assigned to Contract Nos. H2610 and H6200, and enjoining CMS from disclosing and relying on that unlawful rating in connection with any other agency decision.

**COUNT I**
**Violation Of 5 U.S.C. §§ 706(2) – Against All Defendants**
**(Star Ratings Based On Impermissible Data)**

187. Essence realleges the allegations set forth in Paragraphs 1 through 186 of this Complaint as if fully set forth herein.

188. The APA prohibits Defendants from acting in any way that is not in accordance with the law, is in excess of statutory authority, or short of statutory right. 5 U.S.C. §§ 706(2)(A) & (C).

189. Congress specifically outlined the data CMS may use to calculate Star Ratings for MA Plans: "The quality rating for a plan shall be determined according to a 5-star rating system (*based on the data collected under section 1395w-22(e)* of this title)." 42 U.S.C. § 1395w-23(o)(4)(A) (emphasis added).

190. And "Section 1395w-22(e) refers to data collected pursuant to plans' 'quality improvement programs,' under which 'each MA organization shall provide for the collection, analysis, and reporting of data that permits the measurement of health outcomes and other indices of quality.' " *Clover Ins. Co.*, 2026 WL 1483515, at *8 (cleaned up) (quoting *id.* § 1395-22(e)(3)(A)(i)).

191. CMS calculated Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200

using measures that are based on data not collected under § 1395w-22(e), namely, Measures C28 (Members Choosing to Leave the Plan), C30 (Plan Makes Timely Decisions about Appeals), C32 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D05 (Rating of Drug Plan), D06 (Getting Needed Prescription Drugs), D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults).

192. Specifically, to calculate these measures, CMS used data generated outside the HEDIS, HOS, and CAHPS programs established under § 1395w-22(e), including MBDSS data (C28), IRE contractor data (C30), call-monitoring data (C32 and D01), and PDE data (D08, D09, D10, D11, D12).

193. And to calculate Measures D05 (Rating of Drug Plan) and D06 (Getting Needed Prescription Drugs), CMS used Part D CAHPS data administered under Part D authority rather than "data collected under section 1395w-22(e)." 42 U.S.C. § 1395w-23(o)(4)(A).[15]

194. CMS's consideration and use of Measures C28 (Members Choosing to Leave the Plan), C30 (Plan Makes Timely Decisions about Appeals), C32 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D05 (Rating of Drug Plan), D06 (Getting Needed Prescription Drugs),

[15] The Court in *Clover Ins. Co.* noted that while it may seem "on its face" that D05 and D06 comply with the statute, they do not, since "a measure's utilization of CAHPS data is not, standing alone, a sufficient condition to make that data 'collected under section 1395w-22(e).' " *Clover Ins. Co.*, 2026 WL 1483515, at *9.

D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults) to calculate Essence's Part C 2027 Star Ratings for Contract Nos. H2610 and H6200 is a final agency action made reviewable by 5 U.S.C. § 706(2).

195. The consideration and use of these measures to calculate Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 is not in accordance with the law, is in excess of statutory authority, and short of statutory right, in violation of 5 U.S.C. §§ 706(2)(A) and (C).

196. Essence has suffered and will continue to suffer irreparable harm as a result of Defendants' violations of 5 U.S.C. §§ 706(2)(A) and (C).

197. Essence is entitled to injunctive and declaratory relief to remedy Defendants' unlawful conduct, as well as all other relief as set forth in its Prayer for Relief. *See* 5 U.S.C. § 705.

## COUNT II
## Violation Of 5 U.S.C. § 706(2) – Against All Defendants
## (Failure To Engage In Notice-And-Comment Rulemaking)

198. Essence realleges the allegations set forth in Paragraphs 1 through 186 of this Complaint as if fully set forth herein.

199. The APA prohibits Defendants from acting in any way that is arbitrary, capricious, not in accordance with law, or without observance of procedure required by law. 5 U.S.C. §§ 706(2)(A), (C) & (D).

200. Congress requires CMS to engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes

a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Allina*, 587 U.S. at 570 (quoting 42 U.S.C. § 1395hh(a)(2)).

201. But CMS did not engage in notice-and-comment rulemaking or codify "by regulation" – in the Code of Federal Regulations – Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), and C28 (Members Choosing to Leave the Plan) or their specifications that it applied to Essence in determining its 2027 Star Ratings for Contract Nos. H2610 and H6200.[16]

202. Moreover, to the extent CMS might now claim that it did so, CMS did not comply with its notice-and-comment requirements in 42 C.F.R. §§ 422.164(c)(2) and (d)(2) either.

203. CMS's consideration and use of these measures to calculate Essence's Part C 2027 Star Ratings for Contract Nos. H2610 and H6200 is a final agency action made reviewable by 5 U.S.C. § 706(2).

204. The consideration and use of these measures to calculate Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 is arbitrary, capricious, not in accordance with the law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 706(2)(A), (C), and (D).

205. Essence has suffered and will continue to suffer irreparable harm as a result of Defendants' violations of 5 U.S.C. §§ 706(2)(A), (C), and (D).

206. Essence is entitled to injunctive and declaratory relief to remedy Defendants'

---

[16] *See supra* Note 13.

unlawful conduct, as well as all other relief set forth in its Prayer for Relief. *See* 5 U.S.C. § 705.

**COUNT III**
**Violation Of 5 U.S.C. § 706(2) – Against All Defendants**
**(Arbitrary & Capricious)**

207. Essence realleges the allegations set forth in Paragraphs 1 through 186 of this Complaint as if fully set forth herein.

208. The APA prohibits Defendants from acting in any way that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

209. Star Ratings are supposed to be "a true reflection of the plan's quality" and must be based on data that is "complete, accurate, reliable, and valid." 83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).

210. Nevertheless, CMS designated Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health) as "outcome measures" giving them a weighted value of 3 when calculating the 2027 Star Ratings – one of the highest weights given to any specific measure. 2027 Technical Notes at 36–38 (Measures C04 & C05) & 136 (listing weighting categories and numerical weights for each measure).

211. And CMS did so even though these two measures are based on subjective HOS surveys through which patients report whether they believe their physical or mental health is the same or better than expected after two years. 2027 Technical Notes at 36–38.

212. Indeed, although these measures are meant to measure plan performance, they blindly ignore the unfortunate reality that the health of many elderly enrollees naturally declines with age and changes in physical or mental health that are outside an MA Plan's control.

213. In addition, because patient surveys are influenced by countless external factors and noise, all of which is beyond an MA Plan's control, there is no reliable data rationally

connecting those survey responses to the actual quality of MA Plan performance.

214. As such, CMS's decision to assign these measures a weighted value of 3 effectively punishes – through lower Star Ratings – Medicare Advantage organizations like Essence that voluntarily choose to serve the most vulnerable and chronically ill among our nation's aging population.

215. Tellingly, except for Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health), *all* other "health outcome measures" and "intermediate outcome measures" are based on objective, reliable data. 2027 Technical Notes at 136–37 (listing weighting categories for each measure) & 130–31 (listing primary data sources for each measure).

216. In other words, CMS inexplicably chose to measure physical and mental health outcomes by using subjective patient surveys – assigning them heightened weight and thus giving them greater influence over Star Ratings – instead of objective, claims-based measures that capture actual service delivery and health outcomes despite having no evidentiary basis for doing so.

217. But that is not all. Survey methodologies introduce sampling variability, response bias, and recall limitations that do not accurately reflect actual MA Plan performance.

218. Surveys also inevitably lead to survey fatigue and declining response rates, which compromise the representativeness and reliability of survey-based measurement.

219. CMS has acknowledged as much by strongly encouraging MA Plans and vendors to "NOT" ask Medicare enrollees any survey questions four weeks before, during, or after certain CMS survey periods "to promote response rates to both MA & PDP CAHPS and

additional data collection efforts."[17]

220. Yet CMS failed to consider, let alone address, any of these factors.

221. Worse, CMS violated its own regulations. Although CMS previously proposed substantive updates to these measures in the Federal Register in 2020, 85 Fed. Reg. 9002, 9045 (Feb. 18, 2020), CMS ultimately decided to remove these measures from the Star Ratings for several years, 86 Fed. Reg. 5864, 5919 (Jan. 19, 2021), before reintroducing them in 2026.[18]

222. But before reintroducing them in 2026, and using them to calculate Essence Healthcare's 2027 Star Ratings, CMS did not follow the notice-and-comment procedure required by its own regulations, which require CMS to "propose and finalize new measures through rulemaking." 42 C.F.R. § 422.164(c)(2); *see also Elevance Health, Inc.*, 736 F. Supp. 3d at 25 (D.D.C. 2024) (holding CMS's failure to abide its own regulations when calculating Star Ratings was arbitrary and capricious).

223. In the end, CMS's designation and use of Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health) as "outcome measures" – giving them a weighted value of 3 – to calculate Essence Healthcare's Part C 2027 Star Ratings for Contract No. H2610 is a final agency action made reviewable by 5 U.S.C. § 706(2).

224. CMS's consideration and use of these measures to calculate Essence Healthcare's 2027 Star Ratings for Contract No. H2610 is arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A), because (1) these measures are based on subjective, unreliable survey data that is

---

[17] Medicare Advantage and Prescription Drug Plan CAHPS Survey, FAQs for Contracts, https://ma-pdpcahps.org/en/faqs/faqs-for-contracts/ (last visited Nov. 23, 2026).

[18] *See* CMS, *Advance Notice of Methodological Changes for Calendar Year (CY) 2026 for Medicare Advantage (MA) Capitation Rates & Pt. C & Pt. D Payment Policies* (Jan. 10, 2025), https://www.cms.gov/files/document/2026-advance-notice.pdf (last visited Nov. 23, 2026).

not rationally connected to actual MA Plan performance and (2) CMS inexplicably assigned these measures heightened weight despite having no evidentiary basis to do so.

225. Essence Healthcare has suffered and will continue to suffer irreparable harm as a result of Defendants' violation of 5 U.S.C. § 706(2)(A).

226. Essence Healthcare is entitled to injunctive and declaratory relief to remedy Defendants' unlawful conduct, as well as all other relief as set forth in its Prayer for Relief. *See* 5 U.S.C. § 705.

## COUNT IV
## Declaratory Judgment

227. Essence realleges and incorporates Paragraphs 1 through 186 as if fully set forth herein.

228. CMS's calculation of the 2027 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2).

229. Essence is adversely affected and aggrieved by the calculation of its Star Ratings for Contract Nos. H2610 and H6200.

230. An actual controversy has arisen and exists between Essence and Defendants regarding Defendants' calculation of Essence's 2027 Star Ratings for Contract Nos. H2610 using Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health).

231. Essence requests a declaration from this Court under 28 U.S.C. § 2201 that Defendants' calculation of Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 is arbitrary, capricious, otherwise not in accordance with the law, and without observance of procedure required by law.

## PRAYER FOR RELIEF

WHEREFORE, Essence prays this Court vacate Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 and remand this matter to the agency for further consideration.

Additionally, Essence requests the Court to:

1. Adopt an expedited schedule to resolve the merits of this Complaint;

2. Declare that:

- Defendants' use of data that was not collected under § 1395w-22(e) to calculate Measures C28 (Members Choosing to Leave the Plan), C30 (Plan Makes Timely Decisions about Appeals), C32 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D05 (Rating of Drug Plan), D06 (Getting Needed Prescription Drugs), D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults) to calculate Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 was unlawful and in violation of 5 U.S.C. §§ 706(A) and (C);

- Defendants' failure to proceed with notice-and-comment rulemaking before using Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), and C28 (Members Choosing to Leave the Plan) to calculate Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200 was unlawful and in violation of 5 U.S.C. §§ 706(2)(A), (C), and (D)[19];

- Defendants' designation of Measures C04 (Improving or Maintaining Physical Health) and C05 (Improving or Maintaining Mental Health) as "outcome measures" with a weighted value of 3 to calculate Essence Healthcare's 2027 Star Ratings for Contract No. H2610 was unlawful and in violation of 5 U.S.C. § 706(2)(A); and

- Defendants must recalculate Essence Healthcare's 2027 Star Ratings for Contract Nos. H2610 and H6200 without using Measures C04 (Improving or Maintaining Physical Health), C05 (Improving or Maintaining Mental Health), C15 (Reducing the Risk of Falling), C16 (Improving Bladder

[19] *See supra* Note 12.

Control), C22 (Getting Appointments and Care Quickly), C23 (Customer Service), C28 (Members Choosing to Leave the Plan), C30 (Plan Makes Timely Decisions about Appeals), C32 (Call Center - Foreign Language Interpreter and TTY Availability), D01 (Call Center - Foreign Language Interpreter and TTY Availability), D05 (Rating of Drug Plan), D06 (Getting Needed Prescription Drugs), D08 (Medication Adherence for Diabetes Medications), D09 (Medication Adherence for Hypertension), D10 (Medication Adherence for Cholesterol), D11 (Statin Use in Persons with Diabetes), D12 (Concurrent Use of Opioids and Benzodiazepines), and D13 (Polypharmacy: Use of Multiple Anticholinergic Medications in Older Adults).

3. Enjoin Defendants from disclosing and relying on Essence's unlawful 2027 Star Ratings for Contract Nos. H2610 and H6200 in connection with any other agency decision.

4. Require remedial action by Defendants to:

- Issue a public statement of its error and the correction of Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200, to be posted both on the CMS website and in one or more newspapers of general circulation in each community or county located in the service area of said contract;

- Take all actions necessary to ensure that Essence is not competitively disadvantaged as a result of CMS's corrective actions to cure its unlawful star ratings calculations, including but not limited to recalculating Essence's 2027 Star Ratings for Contract Nos. H2610 and H6200; and

5. Award Essence its reasonable attorney's fees and costs, as permitted by law; and

6. Grant such other further relief as this Court deems just and proper.

[*signature page follows*]

Dated: November 23, 2026

By: ____________________
Paul Werner (D.C. Bar No. 482637)
Imad Matini (D.C. Bar No. 1552312)
Christopher L. Bauer (D.C. Bar No. 90021873)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W., Ste. 1000
Washington, D.C. 20006
Tel. 202-747-1900
pwerner@sheppard.com
imatini@sheppard.com
cbauer@sheppard.com

*Counsel for Plaintiffs Essence Healthcare, Inc., and Essence Healthcare PPO, Inc.*